# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE
# AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:08-CR-102 |
| | ) | |
| RAMON CERVANTES-GOMEZ | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on objections to the Presentence Investigation Report ("PSR") filed by the defendant, Ramon Cervantes-Gomez . An evidentiary hearing was conducted on April 5, 2010, where the testimony of DEA Agent Michael Templeton, the defendant and co-defendant, Francisco Urbina, was heard. After due consideration, the defendant's objections will be OVERRULED.

The defendant is one of several defendants arrested on September 23, 2008, and subsequently convicted of conspiracy to manufacture 1,000 or more plants of marijuana. The defendant and co-defendants, Francisco Urbina and Jaimes Esquivel-Lausin, cultivated and maintained a marijuana grow operation in the Pisgah National Forest in western North Carolina. In March, 2008, Urbina, Cervantes-Gomez and Esquivel-Lausin were transported from Johnson City, Tennessee, to the grow location off the Blue Ridge Parkway by a co-conspirator.[1] They were provided a Bersa .45 caliber

---

[1] So far as the Court can tell, the identity of this co-conspirator has never been clearly established. Likewise, the defendants have given conflicting information about who was in charge of the grow operation. Cervantes-Gomez originally told agents Jesus Huerta was involved but later maintained, as did Urbina, that "Jose Chavo" hired them to cultivate the marijuana crop. Huerta was ultimately convicted by a jury.

handgun "as protection against bears."[2]

Urbina, Cervantes-Gomez and Esquivel-Lausin lived in a tent at the marijuana grow site from March 2008, until September, 2008. In late September, 2008, an off-duty Forest Service employee who was searching for ginseng in the national forest stumbled upon the marijuana grow operation. Agents of the Forest Service subsequently set up video surveillance at the marijuana site and the defendant was recorded cultivating the marijuana plants. On September 23, 2008, agents with the Forest Service and other law enforcement agents conducted surveillance on the roadway which provided access to the marijuana patch. Later in the afternoon, Urbina, Cervantes-Gomez and Esquivel-Lausin were observed carrying duffle bags up the path from the marijuana patch to the roadway.

Several minutes later, the three were picked up in a van driven by co-defendant Wiley Barnett. Agents stopped the van and located 193 pounds of marijuana in the duffle bags. Inside one of the duffle bags was the .45 caliber handgun. Agents also found several cell phones in the van and found the numbers of several co-defendants, including that of Jesus Huerta, on both Urbina's and Cervantes-Gomez's phone. Barnett confessed to the agents that he had picked up the defendants and marijuana for delivery to Huerta. On September 24, agents counted a total of 3,717 marijuana plants at the marijuana patch.

Agent Templeton testified at the evidentiary hearing that firearms are part and parcel of the drug trade. He further testified that the handgun, which had a considerable amount of rust, was recovered from one of the duffle bags with marijuana in the back of the van in which the defendant

---

[2] This was stipulated to as part of the factual bases for defendants' pleas of guilty and is quoted from the Plea Agreements.

was arrested, in close proximity to all three defendants. Cervantes-Gomez, in an effort to cooperate, was later interviewed on two occasions by Templeton. During the first interview, the defendant identified the father of Gustavo Gamino-Villa, a co-defendant in this case, as the person who recruited him to work in marijuana trafficking. According to Cervantes-Gomez, Gamino-Villa's father arranged for him to be smuggled into the country by a coyote. According to Cervantes-Gomez, the leader and organizer of the marijuana trafficking operation was Raymundo Miller-Guerra and his lieutenant in Tennessee was Jesus Huerta. During the second interview, Cervantes-Gomez recanted, in large part, what he had told Templeton during the first interview, attempted to minimize the involvement of Jesus Huerta and identified "Jose Chavo" as the person in charge of the grow operation.

Cervantes-Gomez testified that the handgun was found at the marijuana grow site after he and the others arrived at the marijuana patch. According to Cervantes-Gomez, he had never seen a gun before the discovery of the gun at the marijuana grow site. Out of curiosity, he handled the gun and took a picture of himself holding the gun. A picture of Cervantes-Gomez in possession of the firearm was actually recovered from his cell phone. He was told by some unnamed person that the firearm was used for bears and was never told that the firearm was there to protect the marijuana or him from someone trying to get the marijuana. He further testified that he was afraid of the gun and touched it only two or three times while he was at the camp. Cervantes-Gomez acknowledged having Jesus Hureta's number in his cell phone because he was "a friend of theirs and, if something would happen, he would pick them up at the grow site." He denied telling Agent Templeton that Huerta was in charge of the grow site. He acknowledged that the firearm was kept in the tent where

3

he slept.³

In the PSR, the probation officer recommends a two level enhancement in Cervantes-Gomez's base offense level of 26 pursuant to USSG § 2D1.1(b)(1) for possession of a dangerous weapon (the Bersa .45 caliber handgun). The guidelines provide that a two-level enhancement is warranted "if a dangerous weapon (including a firearm) was possessed" during the commission of the crime. Furthermore, the probation officer did not recommend a safety valve reduction under USSG § 5C1.2(a) and 18 U.S.C. § 3553(f), nor a minimal minor role adjustment under USSG § 3B1.2. The defendant objects to both the enhancement under USSG § 2D1.1(b)(1) and claims eligibility for the safety valve reduction, as well as a role adjustment. The government opposes defendant's position.

## Section 2D1.1(b)(1)/Firearm Enhancement

Once the government demonstrates by a preponderance of the evidence that a defendant actually or constructively possessed a firearm during the commission of the drug offense, the government has satisfied its burden under § 2D1.1(b)(1). *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002); *United States v. Snyder*, 913 F.2d 300, 304 (6th Cir. 1990). As noted above, possession may be actual or constructive. *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994). "Constructive possession of an item is the ownership, or dominion or control over the item itself, or dominion over the premises where the item is located." *United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003).

Once the government has met its burden, "a presumption arises that such possession was

---

³ Urbina testifid that the handgun when found was lying on the ground at the marijuana grow site. Cervantes-Gomez denied this, testifying that the firearm was located in a bag in the tent at the grow site.

connected to the offense." *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991) (citing *United States v. Moreno*, 899 F.2d 465, 470 (6th Cir. 1990)). The government need not produce any further evidence to establish a connection between the firearm and the charged conduct to support a § 2D1.1(b)(1) enhancement. The burden is on the defendant to establish that "it is clearly improbable that the weapon was connected to the offense." USSG § 2D1.1(b)(1), App. Note 3. If the defendant fails to make such a showing, then the enhancement is appropriate. *U.S. v. Solorio*, 337 F.3d 580, 599-600 (6th Cir. 2003). In the Sixth Circuit, overcoming the presumption of connection is difficult and a defendant will be found to have overcome it only if he shows that the nature of the weapon found or the circumstances in which it was found makes it extremely unlikely that the firearm had anything to do with the drug offense. *See United States v. Chalkian*, 971 F.2d 1206, 1216 (6th Cir. 1992); *United States v. Garner*, 940 F.2d 172, 176 (6th Cir. 1991).

At the evidentiary hearing on April 15, this Court ruled orally that the government had satisfied its burden of proving that defendant possessed the .45 caliber handgun. Defendant asserts, in his post-hearing supplemental sentencing memorandum, [Doc. 1035], however, that he never knowingly possessed the firearm. He argues that the firearm did not belong to him and "was not his property to dispose of or keep." He asserts that he examined the firearm only out of curiosity and never had any intention of exercising dominion or control over the handgun. Even if the government carried its burden of proof, Cervantes-Gomez argues, he has overcome the presumption and established that "it was clearly improbable that the weapon was connected to the offense," but rather that "it was for protection against the bears and no other purpose."

As the proof in this case relates to Cervantes-Gomez, there is proof, including his own admission, that he actually possessed the handgun at issue in this case. As noted above, a

5

photograph was recovered showing the defendant at the grow site in possession of the firearm. In addition, the defendant admits that, on two or three occasions, he handled the firearm which was kept in a tent which he occupied at the grow site.

Even if there were not proof of actual possession in this case, there is considerable evidence that the defendant constructively possessed the firearm. Constructive possession "exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998). Constructive possession may be proven by circumstantial evidence. And, although presence where a firearm is found is insufficient, without more, to establish the requisite knowledge, power or intention to exercise control over the firearm, *United States v. Birmley*, 529 F.2d 103, 107-08 (6th Cir. 1976), dominion over the premises where the firearm is located is sufficient to establish constructive possession. *Kincaide*, 145 F.3d at 782. Where a defendant is in non-exclusive possession of premises where a firearm is located, it cannot be inferred that he knew the firearm was present and had control of it unless there are other incriminating statements or circumstances to buttress such an inference. *See United States v. Bailey*, 553 F.3d 940, 945 n.3 (6th Cir. 2009).

Defendant's arguments that he did not possess the firearm are problematic for several reasons. As an initial matter, the defendant knew the firearm was present at the camp and that he had the right to control the firearm, evidenced by his actual handling of the firearm. Although the defendant testified that he was unaware that the firearm was at the grow site until sometime after he, Urbina and Esquivel-Lausin arrived at the site, he stipulated, at the time of the entry of his guilty plea, that, in March, 2008, the three defendants were transported to the grow location and "Jose

6

Chavo provided the defendant and co-defendants Urbina and Esquivel-Lausin with a Bersa .45 caliber handgun as protection against bears." [4] Thus, by his own admission, Cervantes-Gomez possessed the firearm and had the right to exercise control over it, regardless of its purpose. As noted above, the government is only required to prove that Cervantes-Gomez possessed the firearm, and not a connection between the firearm and the charged conduct, which is presumed. Once possession is proven, the presumption attaches.

Secondly, Urbina, Cervantes-Gomez and Esquivel-Lausin lived at the marijuana grow site for approximately six months. During that time they had joint dominion and control over the premises. Cervantes-Gomez knew the firearm was located on the premises for almost the entire time and one of the three packed the firearm[5] in one of the duffle bags when they left the site. It appears quite clear that Urbina had dominion over the marijuana grow location and knew that the handgun was located on the premises. Furthermore, he clearly had the power to exercise control over the firearm and it is irrelevant that he might not have actually done so, except on limited occasions. It is also clear that, at least at some point, he intended to exercise control over the handgun, at least "as protection against bears."

Finally, defendant has argued that his mere presence in proximity to the firearm is not enough to establish the requisite knowledge, power or intention to exercise control over the firearm. But this is not a "mere proximity" case. There is more here. *See United States v. Shull*, 349 Fed.

---

[4] In view of the stipulation, the Court does not find Cervantes-Gomez's testimony to be credible. Even absent the stipulation, Cervantes-Gomez's testimony as a whole lacked credibility and, in fact, was largely incredible.

[5] Both Urbina and Cervantes-Gomez testified at the evidentiary hearing that they did not know who put the firearm in the bag when they left the marijuana grow site. Esquivel-Lausin testified likewise at his sentencing hearing.

Appx. 18 (6th Cir. 2009) (citing *United States v. Richardson*, 161 F.3d 728, 732 (D.C. Cir. 1998) (holding that mere proximity to contraband is not enough to constitute constructive possession, but "proximity coupled with 'evidence of some other factor . . .'" is enough) (quoting *United States v. Morris*, 977 F.2d 617, 620 (D.C. Cir. 1992). The factor which distinguishes this case from the "mere proximity" cases is that Cervantes-Gomez knew the firearm was in the camp at the grow location. As the Sixth Circuit recently said in *United States v. Morrison*, 594 F.3d 543 (6th Cir. 2010):

> The critical difference between this case and, say, *United States v. Bailey*, 553 F.3d 940 (6th Cir. 2009), is that here the government presented evidence that *Morrison knew* the gun was within his immediate control. Indeed what the mere-proximity cases seem concerned about, above all, is the conviction of a defendant who did not even know the gun was there. In *Bailey*, for example, the court recounted a long hypothetical about the teenage driver who, through no fault of his own, is completely unaware that a gun lies beneath his seat; and the court said the record before it made *Bailey* no different from that hypothetical. *Id.* at 948-49.

*Id.* at 545.

Nor does Cervantes-Gomez's argument that he has overcome the presumption that his possession of the handgun was connected to the marijuana conspiracy offense have merit. First of all, his argument that the government stipulated that the handgun was provided "as protection from bears" is unconvincing. Even if the handgun was provided for that purpose, that does not foreclose the possibility that the handgun was also provided and available for the dual purpose of protecting both the marijuana crop and the marijuana conspirators from the usual threats associated with drug trafficking. That the handgun was provided by a drug trafficker to other drug traffickers who were engaged in growing and cultivating a large marijuana crop leads to the reasonable inference that there is a connection between the handgun and the marijuana grow operation. The possession of firearms, such as the .45 caliber handgun, is, as the government points out, part and parcel of the

drug trafficking trade. That is especially the case where, as here, the handgun was carried from the grow site with the duffle bags of marijuana and placed in the rear of the van driven by Wiley Barnett on September 23 – the very same duffle bags upon which Urbina, Cervantes-Gomez and Esquivel-Lausin were seated when arrested.

Cervantes-Gomez forcefully argues that this Court should "enforce the terms of his plea agreement" with respect to the firearm enhancement, pointing to the stipulation that the handgun was provided to the defendants for protection against bears. While the government certainly agreed to that stipulation, it did not agree, as defendant argues, that the enhancement of USSG § 2D1.1(b)(1) would not apply in this case and specifically reserved the right to argue other facts relevant to sentencing at the time of the defendant's sentencing. Furthermore, it is clearly arguable that the government is not bound by the stipulation of facts since the plain language of the plea agreement indicates that the facts contained in the stipulation of facts in the plea agreement are submitted for the purpose of establishing a factual basis and it is "the defendant" who agreed to and stipulated to those facts. Application of the firearm enhancement to this defendant does not constitute a breach of the plea agreement's terms by the government.

### Section 5C1.2(a) and 18 U.S.C. § 3553(f)/Safety Valve

The defendant claims that the probation officer was in error when she declined to adjust his sentence on the basis of the "safety valve" provision of USSG § 5C1.2. Defendants who meet all criteria for the safety valve adjustment are entitled to a two level downward adjustment in the offense level and can receive a sentence beneath the mandatory minimum sentence otherwise prescribed. 18 U.S.C. § 3553(f); USSG § 5C1.2; USSG § 2D1.1(b)(11).

To qualify for the safety valve adjustment, a defendant must satisfy five qualifying criteria:

9

He had no more than one criminal history point, he did not use violence or threaten violence in committing his offense or possess a firearm or other dangerous weapon in connection with the offense, the offense did not result in death or serious bodily injury to any person, the defendant was not an organizer, leader, manger or supervisor in the offense and, not later than the time of sentencing, the defendant must truthfully provide to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or a common scheme or plan. 18 U.S.C. § 3553(f); USSG § 5C1.2(a)(1)-(5). The defendant has the burden of proving that he qualifies for the safety valve adjustment. *United States v. Adu*, 82 F.3d 119, 123-24 (6th Cir. 1996).

Cervantes-Gomez's claim for the safety valve adjustment fails with respect to two of the necessary qualifying criteria. First of all, the defendant is precluded from the safety valve adjustment because of his possession of a firearm in connection with the offense. Although there has been some confusion in the Sixth Circuit about whether application of the enhancement of USSG § 2D1.1(b)(1) necessarily precludes application of the safety valve, that confusion has now been resolved. In *United States v. Stewart*, 306 F.3d 295 (6th Cir. 2002), the Sixth Circuit held that where actual or constructive possession of a firearm warrants an increase to defendant's base offense level under § 2D1.1, such possession defeats application of the safety valve. *See also United State v. Johnson*, 344 F3d 562 (6th Cir. 2003) (holding that the imposition of a two-level enhancement under § 2D1.1(b)(1) precludes application of the safety valve). In *United States v. Bolka*, 355 F.3d 909 (6th Cir. 2004), a panel of the Sixth Circuit held that a sentence enhancement under § 2D1.1(b)(1) does "not necessarily preclude the application of a 'safety valve' . . . reduction" under § 5C1.2(a). The Sixth Circuit has now further clarified, however, that the holding in *Bolka* is not

10

controlling and that the rule in the Sixth Circuit remains that an enhancement under § 2D1.1(b)(1) precludes safety valve eligibility. *United States v. Patterson*, 145 Fed. Appx. 988 (6th Cir. 2005). In *Patterson*, the Sixth Circuit concluded that

> [t]he *Bolka* court's conclusion is not supported by the sentencing guidelines or the language in *Johnson*. [*U.S. v. Johnson*, 344 F.3d 562 (6th Cir. 2003) (holding that the firearm enhancement precludes the application of the safety valve)]. When, as here, a defendant cannot rebut the presumption that he possessed a firearm during the commission of an offense by showing that it was clearly improbable that the weapon was connected to the offense, then that defendant is ineligible for 'safety valve' status.

*Patterson*, 145 Fed. Appx. at 993. Thus, because Cervantes-Gomez cannot overcome the presumption that he possessed a firearm during the commission of the offense by showing that it was clearly improbable that the weapon was connected to the offense, he is ineligible for safety valve status.[6]

Secondly, Cervantes-Gomez cannot establish that he qualifies under the fifth criterion for the safety valve adjustment, which requires that he truthfully provide to the government all information and evidence he has concerning the offense. The Sixth Circuit has held that § 5C1.2(a)(5) "clearly requires[s] an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses." *Adu*, 82 F.3d 119 at 124. The related offenses must be "part of the same course of conduct or of a common scheme or plan [as the convicted offense]." *Id.* (quoting § 5C1.2(5)). *See also United States v. Maduka*, 104 F.3d 891, 894 (6th Cir. 1997). If the ability of a defendant to commit a drug offense depends on the active

---

[6] In his supplemental sentencing memorandum, Cervantes-Gomez asserts that he "respectfully disagrees that the unpublished case of *United States v. Patterson* precludes safety valve eligibility." He does not further develop the argument.

participation of other people, information about such participation constitutes information about both "the offense of conviction" and "relevant conduct." *Id.* These requirements reflect the fact that the safety valve "was intended to benefit only those defendants who truly cooperate." *United States v. Odell*, 247 F.3d 655, 675 (6th Cir. 2001) (quoting *United State v. Marin*, 144 F.3d 1085, 1094 (7th Cir. 1998), *cert. denied*, 525 U.S. 916 (1998)).

As noted above, Cervantes-Gomez was interviewed by DEA Agent Michael Templeton twice as a result of his agreement to cooperate. His statements to Templeton were contradictory of each other and conflict with his testimony at the evidentiary hearing. His statements also conflict with the statements of other co-defendants and the testimony heard by the Court at the trial of several co-defendants, including Huerta, who, according to Cervantes-Gomez's last statement to Templeton and his testimony at the evidentiary hearing, was not involved in the marijuana growing operation. Cervantes-Gomez's cell phone had the phone number for Raymundo Miller Guerra and Jesus Huerta. The statements of Cervantes-Gomez lack credibility and he has failed to show he meets the fifth criterion. In short, it cannot be said that Cervantes-Gomez has "truly cooperated." And, in fact, it appears that he failed to cooperate at all. Under these circumstances, he cannot meet the fifth criterion for safety valve eligibility.

### Section 3B1.2/Mitigating Role

Under USSG § 3B1.2, a defendant who was a minor or minimal participant in criminal activity is eligible for a four (minimal) or two (minor) level decrease in his offense level. The adjustment is "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." USSG § 3B1.2, App. note 3(A). A "minimal participant" adjustment "is intended to cover defendants who are plainly among the least

culpable of those involved in the conduct of a group." A defendant's "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." USSG § 3B1.2, App. Note 4. A "minor participant" is defined as one "who is less culpable than most other participants, but whose role could not be described as minimal." USSG § 3B1.2, App. note 5.

Cervantes-Gomez claims that his role in the conspiracy was limited "to watering and harvesting of plants" for a few months in 2008. He alleges that he had no ownership interest in the plants and did not join the conspiracy of his own initiative or intent, but rather took what he initially thought was a legitimate job. He further argues that his part was a relatively small part of a 32 defendant conspiracy involved in the distribution of some 13,132 kilograms of marijuana at a total profit of $7, 927,000 and that the only benefit he received from his participation was food provided at the camp site. He further argues that he had no authority, influence or supervisory role over any other co-conspirator and that he did not have knowledge of the structure or scope of the conspiracy, other than for his limited knowledge relating to the grow site. He therefore claims that he is entitled to a minimal participant role reduction.

As an initial matter, this guidelines objection is moot since the defendant has a 120 month restricted guideline range and faces a ten year mandatory minimum term of imprisonment. In other words, resolution of the objection would not affect defendant's guideline calculation. Beyond that, while defendant is less culpable than some of those involved in this conspiracy, he certainly is not the least culpable.[7] Furthermore, he is being held accountable only for the quantity of marijuana

---

[7] It is important to note that Cervantes-Gomez, Esquivel Lausin, Barnett and Huerta were the only ones convicted of the conspiracy to manufacture more than 1000 or more marijuana plants. The indictment also charged a separate conspiracy involving a much larger group of defendants to distribute and possess with the intent to distribute marijuana. The amount of marijuana noted by defendant

13

with which he was directly involved. It cannot be said that his action with respect to the conspiracy to manufacture marijuana was minor or minimal, but rather the growing and cultivation of the marijuana was a critical part of the conspiracy. In addition, there is some evidence to support that defendant did know the scope of the conspiracy and the roles of others, based on the first statement made to Agent Templeton and the phone numbers stored in his phone.

## Conclusion

In sum, the defendant's objections to the enhancement of USSG § 2D1.1(b)(1) and his objection related to his claim of eligibility for safety valve treatment are without merit and are **OVERRULED**. Likewise, the defendant's objection pursuant to USSG § 3B1.2 is **OVERRULED** and **DENIED AS MOOT**. The Court therefore adopts the calculation of the advisory guideline range contained in the PSR, i.e. a guideline range for imprisonment of 57 to 71 months; however, because the defendant faces a mandatory minimum term of imprisonment of ten years, his restricted guideline range for imprisonment is 120 months. He faces a maximum of life imprisonment by statute.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

including the total calculation by the probation officer of the amount of marijuana involved is both conspiracies.